# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EMILIO D. "MIKE" SANCHEZ,

        Plaintiff,

vs.                                          No. CIV 03-0297 JB/LFG

EUGENE MATTA, EDSON WAY,
and GENE HENLEY,

        Defendants.

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** comes before the Court on: (i) Defendants Edson Way's and Gene Henley's Motion for Summary Judgment, filed April 29, 2004 (Doc. 65); (ii) Plaintiff's Cross-Motion for Partial Summary Judgment, filed May 17, 2004 (Doc. 74); and (iii) Plaintiff's Cross-Motion for Partial Summary Judgment, filed May 17, 2004 (Doc. 75). The Court held a hearing on this matter on June 25, 2004. The primary issues are: (i) whether the Plaintiff, Emilio Sanchez, engaged in protected speech under the First Amendment; and (ii) if so, whether Sanchez has created a genuine issue of material fact whether the Defendants, Edson Way and Gene Henley, unlawfully retaliated against him because of his protected speech. The Court finds that Sanchez engaged in protected speech and that, with the exception of one claim against Way, no genuine issue of material fact exists whether Sanchez' speech was a substantial or motivating factor in any adverse employment action against him. Accordingly, the Court has granted Sanchez' two cross-motions for partial summary judgment, and granted in part and denied in part Way's and Henley's motion for summary judgment.[1]

---

[1] The Court has previously entered two separate Orders disposing of these three motions. <u>See</u> Order, filed July 15, 2004 (Doc. 85); Order, filed July 16, 2004 (Doc. 86). This opinion is intended to explain more fully the Court's reasoning for its previous Orders.

## FACTUAL BACKGROUND

This case arises out of a series of events that occurred during Sanchez' employment at the

National Hispanic Cultural Center.  The National Hispanic Cultural Center is a division of the New

Mexico Office of Cultural Affairs.  <u>See</u> Deposition of Eugene V. Henley at 23:22-25 (taken January

23, 2003).  At all material times, Defendant Way was the Cultural Affairs Officer for the State of New

Mexico.  <u>See</u> Deposition of Jacob Edson Way at 6:8-15 (taken February 9, 2004).  In that position,

Way oversaw nine different divisions, including the National Hispanic Cultural Center.  <u>See</u> Henley

Depo. at 23:22-25.  Defendant Henley is the National Hispanic Cultural Center's deputy director.

<u>See</u> <u>id.</u> at 4:20-25.  Henley and Way were acting under color of state law at all material times.  <u>See</u>

Complaint for Violation of First Amendment and 14th Amendment Equal Protection Rights ¶ 3, at

2, filed March 10, 2003 (Doc. 1)("Complaint"); Defendant's Answer to Complaint for Violation of

First Amendment and Fourteenth Amendment Equal Protection Rights ¶ 3, at 1, filed April 15, 2003

(Doc. 8)("Answer").

The National Hispanic Cultural Center employed Sanchez as the Director of Finance and

Administration.  <u>See</u> Complaint ¶ 4, at 2; Answer ¶ 4, at 1.  On December 21, 1999, Sanchez sent

a grievance to Way regarding Eugene Matta, the executive director of the Center and Sanchez' direct

supervisor.  <u>See</u> Memorandum from Emilio Sanchez to Edson Way (dated December 21, 1999).  The

grievance included a bulleted list of concerns, including allegations of fraud, the inappropriate

collection of state funds as reimbursement for use of Matta's personal vehicle at the IRS mileage rate

when a state vehicle was available, the granting of a translation contract to Matta's sister, the

attempted misuse of state travel funds, violations of the New Mexico Procurement Code, the misuse

of government phones for personal reasons, discriminatory favoritism and preferential treatment

toward certain employees, and harassment of other employees.  See id. at 2-5.  The complaint also addressed other personnel and management issues.  See id.

Way sent a letter to Sanchez acknowledging receipt of the complaint regarding Matta.  See Letter from Edson Way to Emilio Sanchez (dated January 3, 2000).  In that letter, Way informed Sanchez that he would investigate the allegations and requested that Sanchez "refrain from representing Mr. Matta and/or the Hispanic Cultural Center at meetings, public hearings etc. until the investigation is concluded and the matter is resolved."  Id.  Way believed that such a request was necessary for several reasons.  First, he thought it was in the best interest of all concerned for everyone involved to "retire to their corners until we could work this through."  Way Depo. at 24:3-7.  Second, because some of Sanchez' concerns involved the alleged improper use of Hispanic Cultural Foundation funds, Way was concerned that Sanchez was confused about the distinction between state business and Foundation business.  See id. at 25:8-17.  The Hispanic Cultural Foundation is a private entity whose primary purpose is to raise money for the National Hispanic Cultural Center.  See Deposition of Edward Lujan at 4:12-19 (taken February 9, 2004).  Finally, Way was concerned because some of Sanchez' complaints were in areas that Way thought fell within Sanchez' area of responsibility, such as monitoring personal use of state government funds.  See Way Depo. at 20:16-20.

On February 2, 2000, Sanchez received an e-mail from Herman Garcia informing him that, effective immediately, Sanchez was under the direct supervision of Garcia.  See Complaint ¶ 41, at 15; Answer ¶ 41, at 7.  Garcia was the budget officer for the Office of Cultural Affairs.  His office was in Santa Fe.

Sometime in December 1999 or January 2000, Henley interviewed for a position as deputy

director at the Natural History Museum.  See Henley Depo. at 8:6-9.  During an interview with Way, Way informed Henley that the National Hispanic Cultural Center was also looking for a deputy director.  See id. at 8:9-14.  Over a period of several months, they negotiated the terms of that position, and Henley accepted it in February 2000.  See id. at 8:14-20.  There was no vacant position for a deputy director at the Center at that time, the position had not been advertised, and there was no budget item or TOOL number for the position.  See id. at 12:10-23.  Henley was hired as a temporary, or contract, employee.  See Way Depo. at 92:16 to 93:14.

Henley was aware that Sanchez and Matta had experienced some problems, and that those problems had prompted the transfer of supervision to Herman Garcia.  See Henley Depo. at 38:5-9. Both Matta and Sanchez attempted to discuss their past problems with Henley, but he told them both that he was not interested in anything that occurred before the time he began working at the Center. See id. at 39:1-5.  Although Henley attempted to insulate himself from knowledge of Sanchez' complaint against Matta, he did have a general understanding of the nature of the complaint.  See id. at 95:14 to 96:1.  Specifically, Henley knew, at the very least, that Sanchez had accused Matta of misusing public funds.  See id.

On January 18, 2000, Way sent Sanchez a letter informing him that an investigation into his allegations had revealed that Matta had not engaged in fraudulent activity.  See Letter from Edson Way to Emilio Sanchez at 1 (dated January 18, 2000).  In that same letter, Way expressed his disappointment in Sanchez for approaching Ed Lujan, the Board Chairman for the National Hispanic Cultural Center, with concerns about Matta before Way had an opportunity to investigate and act upon those allegations.  See id. at 2.  Way believed that Sanchez should have kept his concerns within the chain of command.  See Way Depo. at 17:2-11; id. at 19:1-6.

On March 17, 2000, Henley issued Sanchez a letter of reprimand for failure to perform tasks by established deadlines and for failure to properly review billings before authorizing payment.  <u>See</u> Written Reprimand (March 17, 2000).  The reprimand related to a budget project for which Sanchez had a deadline.  He was sick and did not come to work on the due date of that assignment.  <u>See</u> Henley Depo. at 30:4-12; Sanchez Depo. at 146:5 to 147:11.  Sanchez disputes the validity of the reprimand because he was out on excused sick leave during that time.  <u>See</u> Leave Report Form (March 13, 2000) and Note from Dr. E. Raimer (March 8, 2000).  Sanchez does not specifically dispute the second portion of the reprimand.

Henley assumed direct supervisory authority over Sanchez sometime near the beginning of May 2000.  This change in supervision was not officially documented in writing until May 19, 2000.  <u>See</u> Letter Re: Change of Supervisor from Herman Garcia to Mike Sanchez (May 19, 2000).  At the time of the written reprimand, Henley was not Sanchez' direct supervisor.  <u>See</u> Henley Depo. at 24:6-24.  Because Sanchez' supervisor was 60 miles away, and Henley was on-site at the Center with Sanchez, Henley believed that he needed to deal with the situation.  <u>See</u> <u>id.</u> at 24:25 to 25:19.

On May 25, 2000, Henley asked Sanchez if he would agree to move offices that afternoon.  Sanchez agreed.  When he returned from lunch that day, Sanchez found that Henley and another employee, David Sanchez, had moved his desk, computer, and personal items out of his original office.  His new office was approximately half the size of his original office.  <u>See</u> Complaint ¶ 51, at 17; Answer ¶ 51, at 8.

Sanchez had expressed a concern about possible retaliation in his grievance.  Thereafter, Way received copies of a number of memos from Matta to Sanchez that allegedly contained retaliatory actions by Matta.  <u>See</u> E-mail from Matta to Sanchez (January 11, 2000)("Your presence is not

required in tomorrow's budget hearings."); e-mail from Matta to Sanchez (January 20, 2000)(removing subordinates from Sanchez' supervision, removing Sanchez' title, and instructing Sanchez not to attend meetings in representation of Center).  Sanchez also sent a number of other e-mails to other officials in Santa Fe.  Sanchez asserts that, despite receiving this information, Way did not do anything to protect him from retaliation.

On July 6, 2000, Sanchez received a Notice of Contemplated Action ("NCA").  See Notice of Contemplated Action.  Matta and Way signed the NCA.  See id. at 12.  The Notice proposed Sanchez' termination for a number of reasons.  The two primary sections of the notice were: (i) "Directing an employee to falsify official records and/or documents: Misconduct; Negligence; Violation of the NM Procurement Code;" and (ii) "Performance which reflects your negligence, incompetence and inefficiency, and which continues to be unsatisfactory after you, the employee, have been given a reasonable opportunity to correct it."  Id. at 1, 3.

While Sanchez does not dispute that he received the NCA, he does challenge the validity of some of the underlying allegations.  With respect to the allegation that he directed an employee under his supervision to falsify official records and/or documents related to the procurement process, Sanchez contends that the employee allegedly involved signed a statement to the effect that Sanchez never asked her to falsify documents.  See Memorandum by Judy Candelaria (June 9, 2000).  Sanchez also points out that the purchase at issue occurred before his employment with the Center, and that the employee who actually attached the three bids to the purchase order was not under Sanchez' supervision.  With regard to the allegation of bid splitting, the employee involved in the supply order testified that she was not bid splitting and that Sanchez did not instruct her to bid split.  See Deposition of Judy Candelaria at 43:12-25 (taken February 16, 2004).

Sanchez also challenges the NCA on the basis that he did not have a history of disciplinary problems.  In March 2000, he received a fully satisfactory performance appraisal by Herman Garcia.  See E-mail from Eugene Matta to Herman Garcia (March 9, 2000)("I read your letter to Mike Sanchez, cc'd to me, where you tell him his evaluation is 'meet expectations.'").  Sanchez contends that, before he filed his grievance against Matta, his record was devoid of any disciplinary action.  He asserts that his superiors began criticizing his performance almost immediately after he filed his grievance and that he did not receive the benefit of progressive discipline.

Although Way signed the NCA, he does not specifically remember reviewing the allegations and supporting documentation.  See Way Depo. at 69:2-11.  He also could not remember whether he reviewed Sanchez' personnel file at the time of the NCA.  See id. at 71:19 to 72:1.  At that time, Way had recently been diagnosed with cancer and was preparing to begin chemotherapy.  See id. at 69:11-21.  He assumes, however, that he would have read the NCA and its attachments.  See id. at 69:10-11.

Henley contends that he and Way determined that it would be inappropriate for Matta to be involved in the NCA.  See Henley Depo. at 102:19-24.  Henley asserts that he made recommendations to Matta, that Matta concurred, and that Henley then worked with others in Santa Fe to draft the NCA.  See id. at 102:24 to 103:4.  Sanchez disputes that Matta was excluded from the preparation of the NCA because the NCA contains references to issues that Sanchez and Matta had previously discussed.  See Matta Depo. at 161:20 to 162:4.  Sanchez also points out that Matta signed the NCA.

A Notice of Contemplated Action is not a termination.  See id. at 70:8-19.  It allows an employee to respond, either orally or in writing, before any official action.  See Notice of

Contemplated Action at 11-12.  In this case, Sanchez did not respond to the NCA.  Instead, he submitted his resignation the day after he received the NCA.  See Letter of Resignation from Emilio Sanchez (July 7, 2000).

## PROCEDURAL BACKGROUND

On March 10, 2003, Sanchez filed this action against four defendants, Eugene Matta, Edson Way, Ed Lujan, and Gene Henley.  See Complaint at 1.  The Complaint alleges two counts against each defendant: (i) retaliation in violation of the First and Fourteenth Amendments; and (ii) violations of the Fourteenth Amendment equal protection clause.  See id. ¶¶ 63-70, at 20-22.   Sanchez sued each defendant in his individual capacity.  See id. ¶ 3, at 2.

Sanchez has agreed to the stipulated dismissal with prejudice of Defendant Ed Lujan.  See Order Granting Stipulated Motion to Dismiss Defendant Ed Lujan and Amend Case Caption, filed April 22, 2004 (Doc. 64).  Sanchez has also stipulated to the dismissal of his Fourteenth Amendment equal protection claims.   See Order Granting Stipulated Motion to Dismiss Plaintiff's Equal Protection Claims Against Defendants Eugene Matta, Edson Way, and Gene Henley, filed May 11, 2004 (Doc. 70).  Thus, only the cause of action for retaliation remains.

Way and Henley move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment, seeking a court order in their favor and against Sanchez on his claim of retaliation.[2]  Way and Henley contend that, as a matter of law, Sanchez' speech is not entitled to First Amendment protection.  They further argue that, even if Sanchez did engage in constitutionally protected speech, such speech was not a substantial and motivating factor in any adverse employment

---

[2] Although Matta has also moved for summary judgment on that claim, Matta's motion is not at issue in this opinion.  The Court has previously denied Matta's motion for summary judgment and issued an order memorializing that decision.  See Order, filed July 16, 2004 (Doc. 86).

action that they may have taken against Sanchez.  Indeed, they deny that any adverse employment action occurred and assert that they are entitled to qualified immunity because Sanchez cannot state a claim for First Amendment retaliation.  Way and Henley have denied Sanchez' allegations and affirmatively state that any employment decisions regarding Sanchez were based upon legitimate business reasons and business needs.

Sanchez has responded to Way's and Henley's motion for summary judgment.  His response included a cross-motion for partial summary judgment on the issue whether he engaged in constitutionally protected speech.  Sanchez included a nearly identical cross-motion for partial summary judgment in his response to Matta's motion for summary judgment.  In its previous Order denying Matta's motion, the Court indicated that it would issue an opinion at a later date explaining its reasoning for granting Sanchez' cross-motion with respect to Matta.  The Court included similar language in its Order regarding Way's and Henley's motion for summary judgment.  Because Sanchez' two cross-motions involve the same issues, the Court will address them together in this opinion.

## LAW REGARDING SUMMARY JUDGMENT

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported  claims or defenses."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Summary judgment is appropriate when the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Bacchus Industries, Inc. v. Arvin Industries, Inc., 939 F.2d 887, 891 (10th Cir. 1991)(quoting Fed. R. Civ. P. 56(c)).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. at 323 (internal quotation marks omitted). A defendant seeking summary judgment may satisfy its burden by pointing to "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998).

Once the moving party has met its burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Sports Unlimited, Inc. v. Lankford Enterprises, Inc., 275 F.3d 996, 999 (10th Cir. 2002)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The nonmoving party "may not rest upon the mere allegations or denials of his pleadings" to avoid summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Bacchus Industries, Inc. v. Arvin Industries, Inc., 939 F.2d at 891 (citing Clifton v. Craig, 924 F.2d 182, 183 (10th Cir. 1991)).

In this regard, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party cannot rest on mere allegations or denials. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. "The non-moving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact." Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1490 (10th Cir. 1995)(citing Celotex Corp. v. Catrett, 477 U.S. at 324). "The mere existence

of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate.  See id. at 249-50.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity protects government officials from individual liability in a § 1983 action unless the officials violated clearly established constitutional rights.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  When a defendant raises qualified immunity as a defense, the plaintiff must then make a two-part showing.  See Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995). "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right." Id.  "Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." Id.  Thus, "a district court's first task in evaluating a defendant's assertion of qualified immunity is to determine whether the plaintiff has alleged the violation of a constitutional right at all."  Radecki v. Barela, 146 F.3d 1227, 1229 (10th Cir. 1998)(citations omitted).  "Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998).  "Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999)(citation omitted).

The United States Court of Appeals for the Tenth Circuit has explained that, "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision

on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Salehpoor v. Shahinpoor, 358 F.3d 782, 785 (10th Cir. 2004)(citations omitted).  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  The Supreme Court has stated that "a reasonably competent public official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. at 819.

"[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).  On the other hand, qualified immunity is not a license for lawless conduct.  See Harlow v. Fitzgerald, 457 U.S. at 819.  In deciding whether a right is clearly established, "[q]ualified immunity does not protect official conduct simply because the Supreme Court has never held the exact conduct at issue unlawful.  Rather, the shield of qualified immunity is pierced if in light of pre-existing law, the unlawfulness of the conduct is apparent to the [official]." Lawmaster v.Ward, 125 F.3d 1341, 1350 (10th Cir. 1997); Anderson v. Creighton, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.")(citations omitted).  See Harris v. Maynard, 843 F.2d 414, 417 n.4 (10th Cir. 1988)("[A] precisely analogous case is not required to pierce an [official's] immunity where the unlawfulness is apparent in light of the pre-existing law.").

## LAW REGARDING FIRST AMENDMENT RETALIATION

The First Amendment, as applied to the states through the Fourteenth Amendment, prohibits government from "abridging the freedom of speech."  U.S. Const. Amend. I.  "A government employer cannot 'condition public employment on a basis that infringes the employee's

constitutionally protected interest in freedom of expression.'" <u>Finn v. New Mexico</u>, 249 F.3d 1241, 1247 (10th Cir. 2001)(quoting <u>Connick v. Myers</u>, 461 U.S. 138, 142 (1983)).  Thus, "a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." <u>Dill v. City of Edmond</u>, 155 F.3d 1193, 1201 (10th Cir. 1998).

      To assess a plaintiff's claim of First Amendment retaliation, the Tenth Circuit applies a four-part test.

> First, "we must determine whether the employee's speech involves a matter of public concern." <u>Dill [v. City of Edmond]</u>, 155 F.3d at 1201.  If so, "we then balance the employee's interest in commenting upon matters of public concern 'against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" <u>Id.</u> (quoting <u>Pickering [v. Board of Education]</u>, 391 U.S. 563, 568 (1968)).  Third, if the balance "tips in favor of the employee, the employee then must show that the speech was a 'substantial factor or a motivating factor in the detrimental employment decision.'" <u>Id.</u> (quoting <u>Gardetto v. Mason</u>, 100 F.3d 803, 811 (10th Cir. 1996)).  Fourth, if the plaintiff establishes that speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." <u>Id.</u>

<u>Finn v. New Mexico</u>, 249 F.3d at 1247.  "The first two questions are ones of law for the court, while the latter two questions are ones of fact for the jury." <u>Barker v. City of Del City</u>, 215 F.3d 1134, 1139 (10th Cir. 2000).

      The Supreme Court of the United States has stated that, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983).

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Id. at 147.  Thus, if Sanchez' speech involved only matters of personal interest, such speech cannot form the basis of a claim for retaliation against a government employer, and the Court need not consider the remaining three factors.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. "'Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [government] officials, in terms of content, clearly concerns matter of public import.'" Patrick v. Miller, 953 F.2d 1240, 1247-48 (10th Cir. 1992)(quoting Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988)).  "[C]ourts customarily focus on whether speech 'was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties' when deciding whether speech qualifies as a matter of public concern." Patrick v. Miller, 953 F.2d at 1248 (quoting Koch v. City of Hutchinson, 847 F.2d 1436, 1445 (10th Cir. 1988), cert. denied, 488 U.S. 909 (1988)).

If the Court concludes that Sanchez' speech touches on a matter of public concern, it must then determine whether Sanchez interest in making those statements outweighs the National Hispanic Cultural Center's interest in the effective functioning of state government.  "'[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.'"  (quoting Connick v. Myers, 461 U.S. at 145 (in turn quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982)).

"[T]he employer must also articulate its proffered interest in regulating the speech in question." Barker v. City of Del City, 215 F.3d at 1139.

A number of factors are considered in evaluating Defendants' interest under the

<u>Pickering</u> balancing test.  Pertinent considerations include "the manner, time, and place of the employee's expression . . . the context in which the dispute arose . . . [and] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

<u>Patrick v. Miller</u>, 953 F.2d at 1248 (quoting <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987)).  "'We will defer to a public employer's reasonable predictions of disruption, but those predictions must be supported by the presentation of specific evidence.  The [employer] cannot satisfy its burden by making purely speculative allegations.'"  <u>Id.</u> (quoting <u>Cragg v. City of Osawatomie</u>, 143 F.3d 1343, 1347 (10th Cir. 1998)).

## LEGAL ANALYSIS

## I.  THE FIRST AMENDMENT APPLIES TO SANCHEZ' SPEECH AND PROTECTS HIM FROM RETALIATION.

Sanchez has moved for summary judgment on the issues whether his speech involves a matter of public concern and whether his interest in engaging in that speech outweighs his employer's interest in regulating his speech to promote the efficiency of the public services it performs through its employees.  Because the Court finds that Sanchez' speech included some issues of public concern, and that a balancing of the parties' competing interests weighs in Sanchez' favor, the Court concludes, as a matter of law, that Sanchez engaged in protected speech.  Accordingly, the Court will grant Sanchez' cross-motions for partial summary judgment.

### A.  SANCHEZ' SPEECH INVOLVED MATTERS OF PUBLIC CONCERN.

Henley and Way contend that Sanchez' speech did not touch on matters of public concern, but rather involved personal grievances regarding internal management and personnel issues.  They argue that many of Sanchez' more serious complaints about Matta were within the realm of Sanchez'

own responsibilities as a director of finance and administration.  Thus, Henley and Way maintain that Sanchez should have investigated the financial issues he complained of and determined whether they were valid concerns that would truly impact the National Hispanic Cultural Center.  They assert that, until the allegations were substantiated, they related only to internal personnel matters.

Henley and Way do not cite any authority for the proposition that a public employee's ability to voice concern over alleged impropriety diminishes if the malfeasance is within that employee's area of responsibility.  Indeed, Tenth Circuit precedent supports the contrary conclusion.  See Patrick v. Miller, 953 F.2d at 1248 ("Patrick's statements concerning potential illegalities in the City budget process most certainly addressed a matter of political and social concern to the community . . . .  [A]s trustee of the retirement fund, Patrick had a duty to inform Board members of what he perceived to be improper conduct.").  Moreover, that the allegations were not yet substantiated does not undermine their First Amendment protection.  See New York Times Co. v. Sullivan, 376 U.S. 254, 271 (1964)("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker.").

The content, form, and context of Sanchez' speech indicate that he intended to address, and did address, matters of public concern.  With regard to content, Sanchez' grievance included allegations of fraud, the inappropriate collection of state funds as reimbursement for use of Matta's personal vehicle at the IRS mileage rate when a state vehicle was available, the granting of a translation contract to Matta's sister, the attempted misuse of state travel funds, violations of the New Mexico Procurement Code, the misuse of government phones for personal reasons, discriminatory favoritism and preferential treatment toward certain employees, and harassment of other employees.

"'Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests.'"  <u>Finn v. New Mexico</u>, 249 F.3d at 1247 (quoting <u>Conaway v. Smith</u>, 853 F.2d at 797).  "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import."  <u>Conaway v. Smith</u>, 853 F.2d at 796.  Indeed, Way conceded in his deposition that allegations of financial impropriety and improper administration were issues of public concern.

> Q.  Okay.  Would you agree, Dr. Way, that raising issues about financial impropriety are in fact issues that really should be of concern to the public?
>
> A.  Absolutely, and that is why I immediately called for an investigation when this was brought to my attention.
>
> Q.  Okay.  And even the administration of such an important institution like the Hispanic Cultural Center, isn't that an issue that is of importance to this community?
>
> A.  Absolutely, absolutely.

Way Depo. at 47:23 to 48:9.

That Sanchez' speech also included internal personnel matters does not preclude First Amendment protection.  Speech which touches on matters of public concern does not lose protection merely because some personal concerns are included.  <u>See</u> <u>Connick v. Myers</u>, 461 U.S. at 149 ("Because one of the questions in Myers' survey touched upon a matter of public concern, and contributed to her discharge we must determine whether Connick was justified in discharging Myers.").  The Tenth Circuit has rejected the argument that a "tidbit" of speech touching on matters of public concern is not entitled to protection because the personal content of the speech dwarfs the public concern content.  <u>See</u> <u>Finn v. New Mexico</u>, 249 F.3d at 1248.

> We hold that the limited portions of plaintiff's speech that touch on matters of public concern are sufficient to satisfy the first step of the <u>Pickering</u> analysis. Of course, our holding does not suggest that a "tidbit" of content touching on matters of public concern will entitle the body of speech, as a whole, to constitutional protection. When a body of speech contains only a "tidbit" of content touching on matters of public concern, the employee's interest in that speech is very limited. Further, the entire body of the speech is considered when evaluating the state's interest. <u>See</u> <u>Johnsen, R.N., v. Independent School District No. 3 of Tulsa County, Oklahoma</u>, 891 F.2d 1485, 1492-93 (10th Cir. 1989)("Therefore, because the speech was a concerted, cohesive campaign on a single subject, the speech should be considered in its entirety for purposes of the <u>Pickering</u> balancing test."). Hence, although not excluded from protection by the first step of the <u>Pickering</u> analysis, a body of speech with only a "tidbit" of content touching on matters of public concern often will not be entitled to protection under the second step.

<u>Finn v. New Mexico</u>, 249 F.3d at 1248-49. Thus, when speech "involve[s] both private and public issues, then <u>Pickering</u> requires a balancing of [the plaintiff's] interest in the speech against the interest of [the] employer." <u>Id.</u> at 1248.

The form of Sanchez' speech also indicates that it was "calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties." <u>Koch v. City of Hutchinson</u>, 847 F.2d at 1445. First, Sanchez communicated his concerns in an official memorandum to Way. In his memorandum, Sanchez told Way that some of Matta's activities "appear to be fraudulent in nature and . . . are not in the best interest of the Center." <u>See</u> Letter from Sanchez to Way at 1 (December 21, 1999). Sanchez also recommended that Way place Matta on administrative leave pending an investigation. <u>See id.</u> at 5. Second, Sanchez communicated his grievance to Way, who occupied the position of Officer of Cultural Affairs, the head of the Office of Cultural Affairs for the State of New Mexico. Third, Sanchez also discussed his concerns with Ed Lujan, the Chairman of the Board for the National Hispanic Cultural Center. Way and Lujan were two high level officers within the organizational structure of the Center who had the ability to take

-18-

action on Sanchez' concerns.  Thus, the form of Sanchez' speech, as well as who he communicated his concerns to, indicates that he intended to address matters of pubic concern.

That Sanchez chose to direct his speech to officers within the Center, as opposed to communicating his concerns in a more public manner, does not remove that speech from the realm of First Amendment protection.

> The First Amendment forbids abridgment of the "freedom of speech."  Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.  We decline to adopt such a view of the First Amendment.

Givhan v. Western Line Consolidated School District, 439 U.S. 410, 415-16 (1979).  Thus, Sanchez' arguably private manner of communication in this case is irrelevant for purposes of the determination whether his speech touched on matters of public concern.

Finally, the context of Sanchez' grievance also indicates that his speech touches on matters of public concern, rather than simply on personal employment issues.  The record does not support Way's and Henley's contention that Sanchez' speech occurred in the context of a persistent dispute between Sanchez and Matta.  Although Way and Henley direct the Court's attention to a memorandum that discusses some problems between Sanchez and Matta, it does not create a genuine issue of fact whether Sanchez' speech was motivated by a pre-existing feud with Matta.  Matta ends the memorandum by telling Sanchez that he has been "enormously helpful to me from the first day you came to the Center."  Memorandum from Eugene Matta to Emilio Sanchez at 2 (November 20, 1999).  Matta and Sanchez also enjoyed a relationship such that Matta would leave Sanchez in charge of the Center during Matta's absence.  See E-mail from Matta to all employees (December 3, 1999)("During my absence, Mike Sanchez will be in charge of the Center.  Please refer all maters to

him."). Accordingly, the Court finds that the content, form, and context of Sanchez' speech establish that it touches on a matter of public concern.

### B. SANCHEZ' INTEREST IN ENGAGING IN HIS SPEECH OUTWEIGHS HIS EMPLOYER'S INTEREST IN REGULATING THAT SPEECH TO PROMOTE EFFICIENT OPERATION OF GOVERNMENT.

Having found that Sanchez' speech touches on matters of public concern, the Court must weigh the parties interests to determine whether Sanchez' interest in commenting on such matters outweighs the Defendants' interest in promoting efficiency through its employees. Under the circumstances of this case, the Court finds that this balancing test favors Sanchez. Thus, his speech is entitled to protection under the First Amendment.

Sanchez' speech addressed alleged a high ranking public official's fraud and misconduct. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Connick v. Myers, 461 U.S. at 145 (internal quotation marks and citations omitted). In addition to engaging in speech that the Supreme Court has deemed worthy of special protection, Sanchez communicated this speech to officials in a relatively non-disruptive manner. He did not speak publicly or send his memorandum to television or newspaper reporters. Rather, he prepared a memorandum detailing his concerns and sent it to Matta's supervisor. This mode of communication is arguably less disruptive than confronting Matta directly.

> Although the First Amendment's protection of government employees extends to private as well as public expression, striking the Pickering balance in each context may involve different considerations. . . . Private expression . . . may in some situations bring additional factors to the Pickering calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.

Givhan v. Western Line Consolidated School District, 439 U.S. at 415 n.4.

Moreover, Way and Henley have not introduced any specific evidence of workplace disruption as a result of Sanchez' speech.  Indeed, they did not address that portion of the Pickering test in their briefs or at oral argument.  The Defendants bear the burden of showing an actual disruption.  Matta's counsel pointed to several examples of alleged workplace disruption, including a breakdown in the relationship between Sanchez and Matta, the necessity of a full scale investigation into the allegations, the transfer of supervisory responsibility over Sanchez to Herman Garcia, and Way's request that Sanchez no longer represent the Center at meetings.  See Transcript of Motion Hearing at 20:3 to 21:4 (June 25, 2004).  The majority of these alleged disruptions, however, are attributable to the Defendants, rather than to Sanchez.  The need for an investigation is not a disruption that outweighs a public employee's right to speak out on concerns of fraud and misuse of government fund.  Breakdown between Sanchez and Matta was likely inevitable under these circumstances and does not eliminate First Amendment protection.  Thus, the Court believes that Sanchez' interest in communicating these concerns in the manner he did outweighs the Defendants' interest in regulating his speech to promote efficient government operation.  Accordingly, the Court will grant Sanchez' cross-motions for partial summary judgment and deny those portions of Way's and Henley's motion that seek judgment based on the protected status of Sanchez' speech.

## II.     WITH THE EXCEPTION OF ONE CLAIM AGAINST DEFENDANT WAY, NO GENUINE ISSUE OF MATERIAL FACT EXISTS WITH RESPECT TO THE THIRD AND FOURTH FACTORS OF THE PICKERING ANALYSIS.

Once a plaintiff establishes that he engaged in protected speech, he then has the burden to show that such speech was a substantial or motivating factor in the detrimental employment decision against him.  A threshold requirement in this analysis is the existence of an adverse employment decision.  See Belcher v. City of McAlester, Oklahoma, 324 F.3d 1203, 1207 n.4 (10th Cir.

2003)("Implicit in the <u>Pickering</u> test is a requirement that the public employer have taken some adverse employment action against the employee."). Because some of Sanchez' allegations of retaliation do not amount to adverse employment actions, the Court need not determine whether Sanchez' speech was a substantial or motivating factor in those decisions. With respect to the acts that do constitute adverse actions, the Court believes that a genuine issue of fact exists as to only one alleged instance of retaliation. Accordingly, the Court will grant in part and deny in part Way's and Henley's motion for summary judgment.

### A.   MANY OF SANCHEZ' ALLEGATIONS DO NOT AMOUNT TO ADVERSE ACTIONS.

Sanchez alleges that the following acts amounted to unlawful retaliation against him in violation of the First Amendment. With respect to Henley, Sanchez contends that Henley retaliated against him by: (i) giving him a letter of reprimand in March 2000; (ii) moving Sanchez out of his office; and (iii) issuing a Notice of Contemplated Action in July 2000. Sanchez alleges that Way retaliated against him by: (i) telling Sanchez that he should not have discussed his concerns about Matta with Ed Lujan; (ii) telling Sanchez not to copy him on e-mails regarding Matta's alleged retaliation; (iii) failing to protect Sanchez from retaliation by Matta; (iv) not remembering whether he read Sanchez' Notice of Contemplated Action before signing it; and (v) requesting that Sanchez refrain from representing the Center at meetings.

The Tenth Circuit has stated that, "[i]f the action taken by the employer in response to the employee's speech is inconsequential or has only speculative consequences, there can be no basis for a First Amendment claim." <u>Belcher v. City of McAlester, Oklahoma</u>, 324 F.3d at 1207 n.4. A number of Sanchez' allegations fall within this category. Henley's act of moving Sanchez out of his

office and into a smaller one is the kind of inconsequential action that cannot form the basis of a First Amendment retaliation claim.  The same is true of several of Way's alleged acts of retaliation.  Telling Sanchez not to copy him on e-mails regarding Matta's alleged retaliation, failing to protect Sanchez from retaliation from Matta, and criticizing Sanchez for approaching Ed Lujan with concerns about Matta are not significantly adverse to serve as the basis for a First Amendment retaliation claim. These actions do not have more than speculative consequences for Sanchez.

Way and Henley argue that the written reprimand and Notice of Contemplated Action are also insufficient to qualify as adverse actions.  They argue that the reprimand had no serious impact on Sanchez and that the NCA was not adverse because Sanchez chose to resign the next day rather than be terminated.  The Supreme Court has explicitly recognized that "deprivations less harsh than dismissal" may trigger First Amendment protection.  See Rutan v. Republican Party of Ill., 497 U.S. 62, 75 (1990).  The Tenth Circuit has found that written reprimands such as the one Sanchez received in this case may constitute an adverse employment action.  See Belcher v. City of McAlester, Oklahoma, 324 F.3d at 1207 n.4 ("While Belcher was not terminated as a result of his speech, the written reprimand specified 'that any more violations of this type will result in more severe disciplinary action up to and or including dismissal from the McAlester Fire Department.'").  The same reasoning applies to the Notice of Contemplated Action.  "Threats of dismissal based on an employee's speech may constitute adverse employment action."  Id.  Thus, the written reprimand and the NCA are sufficiently adverse employment actions to require the Court to consider whether there is a genuine issue of fact whether Sanchez' speech was a substantial or motivating factor in those actions.

**B.     SANCHEZ HAS ESTABLISHED A GENUINE ISSUE OF MATERIAL FACT AS TO ONE OF THE REMAINING ACTS OF ALLEGED RETALIATION.**

**1.     HENLEY IS ENTITLED TO SUMMARY JUDGMENT.**

Sanchez contends that Henley retaliated against him by issuing him a written reprimand on March 17, 2000 and recommending a Notice of Contemplated Action for termination. With respect to the March 17, 2000 reprimand, Sanchez challenges the validity of the basis for the reprimand by stating that he had been on excused sick leave the entire week that the assignment was due. Henley does not contest this fact. Henley concedes that Sanchez was out that week, but states that Sanchez also had the week before he was out sick to either complete the assignment or inform Henley that he was unable to do so. See Henley Depo. at 28:1-20. Sanchez does not dispute that he did neither. Moreover, Sanchez does not attempt to dispute the portion of the reprimand dealing with failure to properly review billings before authorizing payment.

The record indicates that Henley knew of the grievance only in a general way. There is evidence in the record that he attempted not to educate himself regarding the specifics of the grievance. His general knowledge, standing alone, is insufficient to create a genuine issue whether Sanchez' speech was a substantial or motivating factor in the decision to issue the reprimand. There is no evidence to contradict Henley's stated reasons for his action; Sanchez does not offer evidence showing that he did not engage in the conduct attributed to him in the reprimand. His primary argument is essentially that it was unfair to reprimand him for missing a deadline when he was out of work with a valid doctor's excuse. The Court declines to substitute its judgment for the employer's in this manner. Because there is no evidence in the record to create a genuine issue whether Henley based his decision to reprimand upon Sanchez' protected speech, the Court finds that

Henley is entitled to qualified immunity and will grant Henley's motion for summary judgment with respect to the written reprimand.[3]

Sanchez next contends that a genuine issue of fact exists whether his speech played a substantial or motivating factor in Henley's involvement in the Notice of Contemplated Action. Henley was the one who recommended the NCA to Matta and Way. The Court believes, however, that the analysis for the written reprimand applies to the NCA as well. Henley avoided learning the details of the issues between Sanchez and Matta. After working with Sanchez for several months, Henley prepared a detailed Notice of Contemplated Action setting forth numerous concerns and attaching multiple sources of documentation. Sanchez directly challenges only two of the allegations set forth in the NCA. There are numerous others that he does not attempt to dispute. Under these circumstances, and in the absence of other evidence to create a nexus between Sanchez' speech and Henley's decision, no genuine issue of fact exists whether the speech played a substantial or motivating role in Henley's decision to recommend Sanchez' termination. Because Sanchez has not established that his allegations amount to a constitutional violation, Henley is entitled to qualified immunity. Accordingly, the Court will grant the motion to the extent it pertains to Henley.

### 2.    WAY IS ENTITLED TO SUMMARY JUDGMENT IN PART.

Sanchez contends that Way retaliated against him by: (i) not specifically remembering whether he reviewed the NCA before he signed it; and (ii) telling him to refrain from representing the Center

---

[3] Sanchez also argues that it was improper for Henley to reprimand him because Henley was not his direct supervisor. Henley was, however, a supervisor in Sanchez' chain of command in a practical sense. It was a unique circumstance for Garcia to supervise Sanchez from Santa Fe, especially when they were in separate divisions. Sanchez was employed within the Hispanic Cultural Division. Henley was the deputy director of that same division. The Court does not believe that this additional issue creates a genuine issue of material fact whether Sanchez' speech was a motivating or substantial factor in Henley's decision to issue a written reprimand.

until after an investigation was complete.  With respect to the allegation that Way does not specifically remember reviewing the NCA, the Court does not believe that such action, even if true, constitutes a retaliatory or an adverse action.  There is no evidence to show that Sanchez' speech was a motivating factor in Way's failure to review the NCA, if indeed he failed to review it.  The NCA was accompanied by numerous attachments in support, and there has not been a showing that Way based his decision to sign the NCA on Sanchez' protected speech rather than the materials that were submitted to him.  Because Sanchez has not established that his allegations amount to a constitutional violation, Way is entitled to qualified immunity from this claim.  Accordingly, the Court will grant Way's motion for summary judgment on the portion related to an alleged failure to review the NCA before signing it.

Sanchez' final claim against Way is that Way retaliated against him by depriving him of his ability to represent the Center at various meetings.  It is undisputed that, when Way acknowledged receipt of Sanchez' grievance, he requested that Sanchez "refrain from representing Mr. Matta and/or the Hispanic Cultural Center at meetings, public hearings etc. until the investigation is concluded and the matter is resolved."  Letter from Way to Sanchez (January 3, 2000).  Way asserts that this request was reasonable under the circumstances because it relieved some of the tension in the situation by distancing Sanchez and Matta.  In this instance, the request itself creates a genuine issue whether Sanchez' speech was a substantial or motivating factor in Way's decision.

At the Court's request, the parties submitted citations to the record in response to the question whether representing the Center at meetings and public hearings was within Sanchez' job duties prior to his protected speech.  After reviewing those submissions and portions of the record, the Court finds that there is evidence in the record that Sanchez attended some meetings in his

-26-

capacity with the Center.   <u>See</u> Employee Performance Appraisal and Development for Period 07/26/99 to 02/07/00 ("Attend meetings with contractors, architects and other agencies during the construction phase of the center to ensure the Center's physical and plant property requirements are met. . . .   Provide information on plant requirements as well as results of meetings to the Executive Director in a timely manner not to exceed 24 hours of final determination. . . .   Represent the NHCCNM with external agencies to include OCA, the Legislature, Hispanic Cultural Foundation, etc. . . .   Represents the Center effectively in dealing with external agencies and staff.").   Thus, Way's request that Sanchez refrain from such duties altered the terms of Sanchez' employment.   Because Sanchez has established that his allegations concerning removal of his ability to represent the Center may rise to the level of a constitutional violation, Way is not entitled to qualified immunity on this claim.   Accordingly, the Court will deny that portion of the motion.[4]

_____
UNITED STATES DISTRICT JUDGE

---

[4] The Defendants request attorney's fees and costs, but provide no basis for such an award.  Under the American rule, fees and costs are not shifted unless some rule or statute creates an exception.  The Defendants point to no exception, and none appears available.

-27-

Counsel:

Angela Cornell
Law Offices of Peifer & Cornell, LLP
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*


Kevin M. Brown
Brown & German
Albuquerque, New Mexico

    *Attorneys for Defendant Eugene Matta*


Marcia E. Lubar
M. Monica Zamora
Beall & Biehler, An Association
Albuquerque, New Mexico

    *Attorneys for Defendants Gene Henley and Edson Way*